Filed 11/23/20  S.C. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| S.C.,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>THE SUPERIOR COURT OF MONTEREY COUNTY,<br><br>　　　　Respondent,<br><br>MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES,<br><br>　　　　Real Party in Interest. | H048483<br>(Monterey County<br>Super. Ct. No. 19JD000146) |

S.C. (the minor), an infant girl, was placed in protective custody on December 23, 2019, shortly after her birth.  The Monterey County Department of Social and Employment Services, real party in interest (Department), filed a juvenile dependency petition on December 26 alleging the failure of the mother, C.B. (mother), and the father, S.C. (father), to protect and provide support for their child under Welfare and Institutions Code section 300, subdivision (b).[1]  The Department alleged that mother

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

and father (hereafter, collectively, the parents) were homeless, and mother had a history of alcohol and methamphetamine abuse. The hospital where the minor was born reported that the minor had tested positive for amphetamine, methamphetamine, and marijuana. The juvenile court sustained the allegations of the petition in February 2020, and it granted the parents family reunification services. On September 29, 2020, after a six-month review hearing, the court terminated the parents' family reunification services and scheduled a selection and implementation hearing pursuant to section 366.26 (366.26 hearing) for December 15, 2020.

Father filed a petition for extraordinary writ to compel respondent superior court to vacate its order terminating his family reunification services. He contends that the juvenile court erred in finding that the Department had offered or provided reasonable services to him, and that the Department, in fact, did not afford father reasonable visitation of the minor. We conclude that father forfeited this challenge to the juvenile court's order at the six-month review hearing, and that, even were we to consider the forfeited claim, it lacks merit. Accordingly, we will deny the petition.

## I. FACTS AND PROCEDURAL HISTORY

### A. Petition and Detention (December 2019)

On December 26, 2019, the Department filed a juvenile dependency petition alleging that the parents had failed to protect the minor (§ 300, subd. (b)), who was detained on December 23, 2019.

The Department alleged further that mother had five children, including the minor; the four older children did not live with mother. The Department reported that since 2002, it had received 18 referrals for the family.

The Department alleged that on December 16, there had been a referral to it of general neglect relative to the minor. She had tested positive at birth for THC, methamphetamine, and amphetamine; the baby was being monitored for drug withdrawal symptoms, and she had experienced feeding issues that had resolved. Based upon a

2

second testing of mother within three days of her having given birth, mother tested positive for methamphetamine and THC. In an interview by a Department social worker shortly after the minor's birth, mother denied methamphetamine use but admitted she had smoked marijuana " 'a couple of days ago.' " Father disputed the minor's drug test results, stating, " 'It does not make sense for me. The baby was fine and no possible way the baby can be positive because the baby has [had] no contact with meth whatsoever.' " Additionally, when father was informed by hospital staff about the baby's positive drug test results, he "became aggressive and intimidating," requiring the intervention of hospital security. Father also reported that he was homeless and that he and mother had limited provisions for the minor.

The hospital reported that mother had a history of homelessness and a substance abuse history involving alcohol and methamphetamine. Mother was homeless at the time she gave birth, and had not received prenatal care.

On December 18, the Department held a meeting with mother and father to express its concerns, including mother's primary welfare history, her failure to reunify with her other children, her past and ongoing substance abuse issues, and her homelessness. The family was able to develop a safety plan during the meeting in which mother, father, and the minor would live with a "near-kin" couple in Salinas with father acting as primary caregiver and the family participating in voluntary family maintenance services. The Department later contacted the "near-kin" person, who advised that—as she had previously agreed with mother—she would accept mother and the minor into her home but not father, with whom she and her husband did not feel comfortable. On the same day, the Department was advised "that the parents had become belligerent and [had] wanted to leave the hospital with the baby without the baby being discharged."

On December 19, mother tested positive for marijuana and methamphetamine. Father voluntarily submitted to testing, but the urine sample he provided appeared to have been watered down and was not warm.

On December 20, it was reported that mother had attempted to breastfeed the minor against the physician's orders; she was found asleep on top of the minor, and the physician expressed a number of concerns about mother's parenting skills, substance abuse, and housing. The Department advised mother that day that, upon the minor's discharge from the hospital, the minor would be placed into protective custody The social worker explained that the Department had developed additional concerns about the safety of the minor, including the fact that father, who was intended to be the primary caregiver, would not be allowed by the near-kin family to live with mother and the minor.

When the minor was discharged from the hospital on December 23, she was placed in protective custody. The Department alleged the minor would be at substantial risk of suffering serious harm if she were left in the custody and care of the parents.

At the December 27 detention hearing, the court ordered the minor detained pursuant to section 319, subdivision (c)(1), finding there to be a substantial danger to the physical health of the minor or that she was suffering severe emotional damage, and that there were no reasonable means of obtaining her protection without her removal from her parents' physical custody.

### B. Jurisdictional/Dispositional Orders (February 2020)

#### 1. Jurisdiction/Disposition Report

The Department filed a jurisdiction/disposition report on January 30, 2020. It noted that the minor had been placed in a concurrent resource family home in Monterey County, and she was reportedly doing well in her placement. This was also the home of the minor's half-brother. From a medical examination conducted on January 7, the minor "was found to have age appropriate development."

Mother had a criminal history of five misdemeanor convictions, three of which were drug- or alcohol-related. Father had a criminal history of three misdemeanor convictions, including one drug-related conviction.

4

The Department elaborated on the child welfare history involving mother. She had four children besides the minor. All four children had been involved in dependency proceedings where, in each instance, mother had received reunification services that were ultimately terminated. One child was a nonminor dependent. Another was in a legal guardianship. A third child was in long-term foster care with a goal of legal guardianship. And a fourth child was adopted after the termination of parental rights.

The social worker met with the parents in January 2020, and they "adamantly denied" most of the allegations of the petition. Mother responded to the claim that she had not received prenatal care by stating that she had not learned she would be having a baby until she was 29 weeks into her pregnancy. She stated that she had had a prenatal appointment at Natividad Hospital in October 2019, and she had been told that the baby was fine. She took care of herself and ate well for the balance of her pregnancy. Mother also denied that she had tried to breastfeed the minor in the hospital. Mother admitted that she had a past problem with alcohol, but she denied she had ever used methamphetamine. Mother could not explain how the minor had tested positive for amphetamine and methamphetamine. Father also denied that he had been aggressive or intimidating with hospital staff or that hospital security had been called to respond to his conduct. With respect to the parents' housing, they indicated to the social worker that they were performing work on their recreational vehicle (RV) to make it safe for the minor to live in it with them.

The parents visited the minor weekly for two hours in supervised visitation. They were reportedly very loving and attentive toward the minor.

The Department reported that the parents loved the minor very much and they were willing to make all efforts to provide a safe and stable environment for the baby. Father was reported to have been looking for fulltime employment consistently, and he stated he was open to participate in services. But the Department concluded that father "appeared apprehensive in participating in services, declining to participate in the Family

5

Mental Health Assessment." It appeared to the Department that mother and father had a loving and supportive relationship. The Department recommended, inter alia, that the minor be removed from the parents' physical custody, and that family reunification services be offered to both parents.

### 2. *Jurisdictional/Dispositional Hearing*

The juvenile court conducted a contested jurisdictional/dispositional hearing on February 25, 2020.[2] The juvenile court found the allegations of the petition true, and it found by clear and convincing evidence that there was or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if she were returned to the home and that there were no reasonable means to protect the minor without her removal. The court therefore ordered the minor's removal from the parents' physical custody, placing her with the Department, and the court ordered that the parents receive family reunification services. The parents were also granted visitation rights in accordance with their respective case plans, with visits arranged by the Department. In its order, the juvenile court advised the parents that because of the young age of the minor, services would be offered for six months, after which time the court would look to permanency for the minor.

### C. Six-Month Review Order (September 2020)

### 1. *Department's Report*

On August 26, 2020, the Department filed a report in anticipation of the six-month review hearing.[3] After reviewing the information that resulted in the detention of the

---

[2] The clerk's minute order describes the matter as "Hearing: Jurisdictional – Contested." It is clear from the reporter's transcript that the juvenile court conducted a combined jurisdictional and dispositional hearing.

[3] The six-month-review hearing was originally scheduled for August 25, 2020. The Department requested a continuance of the hearing due to the COVID-19 pandemic and then-existing fires and evacuations in Monterey County, and the court continued the hearing to September 8.

minor, the Department provided an update. It advised that the parents were in a romantic relationship and resided together in an RV. Neither parent was employed, and both were receiving unemployment benefits. They supplemented their income by performing various small jobs.

It was reported that mother had been initially resistant to completing a Family Mental Health Assessment (FMHA), but that in March 2020, she had agreed to a meeting with Dr. Rosie Hernandez. Thereafter, mother failed to meet with the FMHA professional, Dr. Hernandez, and the referral was therefore closed in April. The social worker spoke with mother, and she agreed she was willing to engage in the FMHA. The case worker issued a new referral; she was advised on July 31 that mother had not participated in the process, and the referral was closed.

Mother reported that she had been clean since December 13, 2019, and her last consumption of alcohol had occurred on April 30, 2019. In late April, however, the Department learned that mother's adult daughter had borrowed mother's pencil case that had contained a weed grinder with " 'small pieces of rocks' " believed to be crystal methamphetamine. Mother later told the Department that she had not been in possession of the pencil case since August 2019. On May 1, 2020, mother tested positive for amphetamines through a hair follicle test. The Department contacted mother on June 18, 2020, and left a message requesting that mother submit to a drug test by 5:00 p.m. that day; mother did not submit to a test, and the social worker informed her that the missed test would be deemed a positive test result. During a supervised visit between the parents and the minor on June 30, "mother appeared dazed and under the influence." On July 1, the case worker asked mother to submit to a drug test by 5:00 p.m. that day; mother failed to do so. During a meeting with the parents on July 23, the social worker requested that mother drug test that day by 5:00 p.m.; she did not submit to a test that day and her missed test was deemed a positive test. On August 13, the social worker requested that mother submit to a drug test. Mother arrived at 6:53 p.m., and she refused

to provide a hair follicle sample; she was advised at the testing center that this would be an automatic fail. Mother provided a sample for a 10-panel test; the result for methamphetamine was inconclusive.

Mother was assigned a mentor parent, but mother had not been in consistent contact with her. Mother had not obtained a sobriety sponsor during the review period. On May 1, mother told the Department she had not been attending Alcoholics Anonymous (AA)/Narcotics Anonymous (NA) meetings because of COVID-19 shelter-in-place orders. The social worker suggested that mother attend meetings through video conferencing and that mother contact her mentor parent to assist her. As of two and one-half months later, although mother had reported attending one to three NA meetings per week through ZOOM, she had not provided a signature log documenting her attendance.

Mother also participated in the 12-week Nurturing Parents program. Her attendance and participation in the program were inconsistent, but she ultimately completed 11 of 12 classes.

Father had initially been resistant to the FMHA, but ultimately agreed to an appointment with Dr. Hernandez for March 17, 2020. Dr. Hernandez made multiple attempts to engage father without success, and the referral was closed on April 4. The referral was reopened after father expressed his willingness to participate in the FMHA. He did not engage in services, and the case was closed on or about July 31.

It was reported by father that he did not use alcohol or drugs, he opposed drug use, and would not permit substances in his home. He obtained an assessment from Door To Hope in May 2020, and was found, based upon the information he provided, to not meet the criteria for substance use treatment. The Department contacted father on June 18, 2020, and left a voicemail and a text message requesting that he submit to a drug test by 5:00 p.m. that day; father did not submit to a test, and it was deemed a positive test result. The Department requested that father submit to a random drug test on July 1.

8

He acknowledged the request but did not appear for the test. During a meeting with the parents on July 23, the social worker requested that father submit to a drug test that day; he did not submit to a test that day and his missed test was deemed a positive test. On August 13, the social worker requested that father submit to a drug test. Father arrived at 6:53 p.m., and he refused to provide a hair follicle sample; he was advised at the testing center that this would be an automatic fail. Father provided a sample for a 10-panel test; the result for methamphetamine was inconclusive.

Father participated in the Nurturing Parents program. He "struggled with consistency throughout the program," both in terms of his attendance and completion of coursework. He ultimately completed 11 of 12 classes, and the Department therefore considered his coursework to have been completed.

Mother and father participated in joint, in-person, supervised visitation of the minor once a week for one hour. The parents "were observed to [have been] affectionate, engaging, and playful." They were attentive to the minor, took turns holding her, and soothed her when she cried. Due to COVID-19 Shelter-in-Place orders, visitation was modified in March; on March 17, the parents attended supervised visits with the minor through video calls. The video calls were 30 minutes in duration, and the minor appeared able to recognize her parents' voices and attentively stared at the phone screen during the calls. During a June 30 supervised video visit, father appeared sleepy and "dazed," closed his eyes frequently, and became "less and less alert" as the visit progressed, suggesting that he was under the influence. In-person visitation resumed on July 10. The parents visited consistently, arrived prepared for the visits, and showed the minor love and affection during the visits.

The minor was residing with a concurrent resource family described as a "near-kin placement." The foster family reported that the minor was doing well, and that they would participate in any services she needed. The minor was diagnosed in February with colic for which she was receiving treatment. She received a six-month checkup in June

that resulted in a referral to an ophthalmologist due to concerns about a tear duct blockage. The minor saw the specialist in July and was considered at that time to be healthy. The minor was also considered as of the time of the report to be developmentally on track for a baby of her age. She received an assessment, and it was determined that her medical circumstances did not require additional services.

The Department indicated that it had provided the parents with support that included case management, monthly contact, arranging visitation, providing referrals for services, meeting at least monthly, monitoring the parents' case plan compliance, facilitation of Child, Family, Team (CFT) meetings, informing the parents of the juvenile court process and their rights, and ensuring the minor's receipt of medical care.

The Department observed that the minor had been placed in a concurrent and loving home in which she continued to thrive. The minor had formed a healthy attachment with her caregivers, who had expressed their continued commitment to the minor and had expressed their interest in giving her permanency through adoption.

It was concluded by the Department that mother had not (1) participated in substance abuse services; (2) demonstrated that she could maintain her sobriety from substances, this being her fifth dependency case resulting from substance abuse issues; (3) participated in mental health treatment services necessary to address her substance use issues; and (4) demonstrated that she could meet the developmental needs of the minor. It concluded further that father had not (1) participated in substance abuse services; (2) participated in mental health treatment services necessary to address his substance use issues; (3) demonstrated that he could meet the developmental needs of the minor; (4) shown a significant change in his circumstances and "ha[d] not made much progress towards mitigating the reasons for dependency"; (5) shown an ability to protect the minor or to ensure that she would be cared for by sober adults; and (6) demonstrated accountability for his part in the circumstances that resulted in the minor's removal. The Department also observed that mother and father were the "biggest support" for each

10

other, and while substance abuse was and remained the issue in the dependency, "the parents ha[d] demonstrated little urgency to support each other in arriving at the drug-testing site on time, despite continuously being informed to drug test on the morning of [the requested test date]."

The Department noted further that the minor was under three at the time of her removal, and therefore the parents were generally entitled to six months of services. It concluded that the parents had made minimal progress in mitigating the reasons for the removal of the minor, and it was not substantially probable that the minor would be able to safely reunify within the time provided by law.

The Department recommended that the minor continue in out-of-home care, that the parents' reunification services be terminated, and that the court schedule a 366.26 hearing.

### 2. Six-Month Review Hearing

Father indicated an intention to contest the six-month review hearing, and the court therefore issued a continuance. The juvenile court issued a second continuance of the review hearing at the request of the parents. Father's counsel argued in his brief that father should continue to receive reunification services because he had made reasonable efforts to comply with his case plan. He argued that he had made, and continued to make, reasonable efforts to address the issues that had led to the minor's removal. Father noted that he had (1) completed his drug and alcohol assessment, (2) participated in the Nurturing Parents program, (3) been relatively consistent in maintain contact with the Department, (4) participated in all supervised visits with the minor, (5) attended all CFT meetings, and (6) continued efforts in seeking employment and housing. In addition to a trial brief, father filed written objections to the Department's report.

A contested six-month review hearing occurred on September 29, 2020. The Department submitted the matter on its report.[4] Father testified on his own behalf.

Father testified that a mental health assessment was part of his case plan. He stated that he had made several attempts to reach the Mental Health Department but had been unsuccessful, and he had not completed a mental health assessment. Father testified that testing for substances had originally been part of his case plan, but that the social worker initially assigned told him she would be talking to her supervisor to modify the case plan and eliminate drug testing. The drug testing requirement in the case plan was never eliminated. He admitted he had not submitted to testing on June 18, July 1, and July 23 as requested by the Department; he had not done so because he had been working all day on each occasion. He stated that when he had called to ask if he could test the next day, the social worker responded in the negative. Father did submit to two drug tests within the previous six months, and both tests were negative.

For approximately one month, father and mother had had joint supervised in-person visits with the minor. The parents interacted with the baby by reading books, changing her diapers, feeding her, playing with her, and father singing to her. After approximately one month, the visits were changed from in-person to video visits because of the COVID-19 pandemic. The visits were once a week for 30 minutes; father made several requests for increased visitation that were unsuccessful. Father admitted that in addition to the half-hour video visits, the parents had had Facebook messenger video visits of up to 30 minutes with the minor when the caregiver had time. Video visitation continued from March to the end of July, when in-person visitation resumed. The in-person supervised visits were once per week at a park in Marina; the length or frequency of visitation never increased between July and September. Father testified that he and

[4] The Department asserted at the hearing that the hearing had been previously continued to permit father to provide documentary evidence to the court. Father's counsel stated that he had filed no such documents.

12

mother had never missed a scheduled visit; he admitted they had been slightly late at times logging on to ZOOM for video visits because of their unfamiliarity with the system and because of their limited reception. He asserted that had it not been for the pandemic, the parents would have progressed to overnight visitation.

Father testified that although he had been unable to have any physical contact with the minor from March through July, he had kept in contact with the caregiver and had supplied the baby, through the caregiver, with diapers, formula, food, clothing, books, and toys. He had also completed parenting classes.

Father testified that he and mother had bought an RV in May that was in great condition and was much nicer than their prior RV for which repairs had been needed. The replacement RV was purchased after the former caseworker told father in February that if the parents were to renovate the old RV to make it livable or obtain a new RV that was a stable residence, the minor would be returned to father.[5] The current social worker inspected the new RV in July; she said that it was suitable for the minor that that the parents were, with "[a] few little hiccups," "on track." Father also purchased a van in August that he used for transportation, instead of the bus, to jobs.

Father was receiving unemployment. He testified that he was a cook by training, but that the pandemic had drastically impacted the restaurant industry. He had also been working on fence jobs and had been doing handyman work as it appeared.

Father testified that he was a good parent. He had raised his two older sons, who were now adults. Father testified there was no reason he could not raise the minor. Father and mother lived together, and it was their plan to raise the minor together. He testified that his plan was that, when he was working, mother would take care of the minor. He testified further that if he were working, he would obtain whatever childcare

---

[5] Father agreed with the Department's assessment that the RV the parents had prior to May was not a suitable living environment for the minor.

was needed, including assistance from the caregiver, who had previously offered to help with childcare.

According to father's testimony, Mother had a past alcohol problem. He denied that mother had a past drug abuse problem.

Father called the caseworker, Sokcheat Son, to cross-examine her concerning the contents of the Department's report. Son was assigned to the case in March. At the time, the parents were receiving one-hour of supervised in-person visitation each week; at the time the COVID-19 pandemic required that visitation occur by videoconferencing, the Department was in discussion to add one day of one-hour visitation per week. When in-person supervised visits resumed in early July at a park in Marina, they were at a level of one day per week for one hour. The parents requested an increase in visitation but the Department "did not have the capacity to increase visitation." Son testified that had there been the capacity to increase visitation, it would have been unlikely the Department would have increased visitation for the parents because of (1) their lack of progress in the treatment plan, (2) the fact that they were not consistently drug testing, (3) the Department's concerns that the parents were still actively using substances, and (4) the Department's concerns during video visits "where the parents were falling asleep and not attentive." Son testified that the in-person visits beginning in July had gone well, father had engaged in age-appropriate activities, and it had appeared the minor recognized him.

During examination by the Department's counsel, Son testified that the parents' performance in visitation was only one of multiple factors considered by the Department in assessing the parents' progress. Other factors in determining whether to recommend termination of services included the parents' engagement in services overall, whether they had been able to practice learned skills during visits, and whether they had demonstrated that they were clean and sober. Son testified that it was concerning that father continued to deny that the minor had been exposed to drugs in utero in that father "ha[d] not been able to come to accept the reality of why this dependency started. There

14

[was] medical documentation showing that . . . [the minor] did test positive for these substances, as well as the mother, even in the neonatal care. . . . [¶] . . . [T]here [was] confirmed documentation that there [was] substance use concerns in the home, but he [had denied] it and refuse[d] to believe it." In Son's view, if the parents were provided another six months of services, it was unlikely that their engagement level would change or increase or that their behaviors would alter.

After hearing argument from counsel, the court adopted the recommended findings of the Department. The court found, inter alia, that (1) based upon clear and convincing evidence, the Department offered or provided to the parents reasonable services designed to assist them to overcome the problems that led to the minor's removal; (2) the Department complied fully with the case plan; (3) neither mother nor father was actively involved in the development of the case plan; (4) mother and father failed to participate in regularly in the court-ordered treatment programs; (5) the progress of mother and father toward alleviating or mitigating the causes that had necessitated the minor's placement in foster care had been minimal; (6) out-of-home placement of the minor was necessary; (7) the home in which the minor was placed was appropriate; (8) return of the minor to the parents would create a substantial risk of detriment to the minor's safety, protection, or physical or emotional well-being; (9) the minor was under three years old at the time of her removal; (10) based upon clear and convincing evidence, the parents had failed to participate regularly and make substantive progress in a court-ordered treatment plan; and (11) based upon clear and convincing evidence,[6]

---

[6] Although the court made this finding based upon clear and convincing evidence, it was only required to do so by a preponderance of the evidence. Under subdivision (e)(3) of section 366.21, while the finding that "the parent failed to participate regularly and make substantive progress" must be based on clear and convincing evidence, the finding that there was no "substantial probability that the child . . . may be returned to his or her parent . . . within six months" requires only a

15

there was not a substantial probability that the minor may be returned to one or both of the parents within six months. The court terminated reunification services for both parents and scheduled a 366.26 hearing for December 15, 2020.

### D. Petition for Extraordinary Writ (October 2020)

Father filed timely under rule 8.450(e) of the California Rules of Court[7] a notice of intent to file a petition for extraordinary writ to review the court's order of September 29, 2020, terminating services and scheduling a 366.26 hearing. Thereafter, father filed his petition for extraordinary writ with this court on October 28, 2020. (See rule 8.452.) Real party in interest Department filed its opposition on November 9, 2020.[8]

## II. DISCUSSION

### A. Applicable Dependency Law

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. [Citations.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) As our high court has explained, "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.] Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the

---

preponderance of the evidence. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020) § 2.152[5][b][ii], pp. 2-623 to 2-624.)

[7] All further rule references are to the California Rules of Court.

[8] Mother filed a notice of intent to file a petition for extraordinary writ to review the court's order of September 29, 2020, under rule 8.450(e). She did not file a petition for extraordinary writ with this court within the time provided by law. Accordingly, any such challenge by mother to the court's order has been abandoned. (*Roxanne H. v. Superior Court* (1995) 35 Cal.App.4th 1008, 1012 [failure to timely file petition for extraordinary writ challenging order setting 366.26 hearing requires dismissal of the petition].)

16

absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

A high priority in dependency proceedings is placed upon the expeditious implementation of services and placement of the dependent child. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 674.) Our high court—enunciating a point very relevant to this case involving a child who was approximately one week old at the time of her removal—has explained: "We have long recognized that providing children expeditious resolutions is a core concern of the entire dependency scheme. [Citations.] If this is true of dependency cases in general, it is doubly true for the very young." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 847, fn. 4 (*Tonya M.*).)

The juvenile court at the jurisdictional hearing must first determine whether the child, by a preponderance of the evidence, is a person described under section 300 as coming within the court's jurisdiction. (§ 355, subd. (a).) Once such a finding has been made, the court, at a dispositional hearing, must hear evidence to decide the child's disposition, i.e., whether he or she will remain in, or be removed from, the home, and the nature and extent of any limitations that will be placed upon the parents' control over the child, including educational or developmental decisions. (§ 361, subd. (a).) If at the dispositional hearing, the court determines that removal of the child from the custody of the parent or guardian is appropriate, such removal order must be based upon clear and convincing evidence establishing that one of five statutory circumstances exists. (*Id.*, subd. (c).) One such circumstance is when "there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's

17

physical health can be protected without removing" him or her from the physical custody of the parents. (*Id.*, subd. (c)(1).)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (*Id.*, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family. (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303.)[9] As explained by one court: "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible. [Citation.] To achieve that goal, ordinarily a parent must be granted reasonable reunification services. [Citation.] But reunification services constitute a benefit; there is no constitutional ' "entitlement" ' to those services. [Citation.]" (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Reunification services that are ordered generally (subject to exceptions and instances in which the period may be extended) begin with the dispositional hearing and, for children three years or older, end 12 months thereafter. (§ 361.5, subd. (a)(1)(A).) But where a child is under three at the time of his or her initial removal, reunification services are normally granted for a period of six months, but no longer than 12 months after the minor's placement in foster care. (*Id.*, subd. (a)(1)(B).) Therefore, as the

---

[9] "Except as provided in subdivision (b), . . . whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians. . . ." (§ 361.5, subd. (a).) A court may order that reunification services be bypassed altogether if one of the circumstances specified in subdivision (b) of section 361.5. is established by clear and convincing evidence.

Supreme Court has explained, for parents of a child under three at the time of removal, the statutory scheme of providing reunification services establishes "three distinct periods and three corresponding distinct escalating standards." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.) In the first period—a phase where services are "presumed"—from the jurisdictional hearing to the six-month review hearing, "services are afforded essentially as a matter of right [citation]." (*Ibid.*) In the second phase—a period where services are "possible"—from the six-month review hearing to the 12-month review hearing, "a heightened showing is required to continue services." (*Ibid.*) And in the third phase—a period where services are "disfavored"—from the 12-month review hearing to the 18-month review hearing, "services are available only if the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.' [Citation.]" (*Ibid.*)

Prior to the permanency hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months. (§ 366, subd. (a)(1).) "At the review hearing held [six] months after the initial dispositional hearing [the six-month review hearing], . . . the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) Because they are conducted at a stage when the juvenile court may deny further reunification services to the parent, "[r]eview hearings are critical." (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 61; see also *In re Derrick S.* (2007) 156 Cal.App.4th 436, 450 [reunification is "standard topic at" six-month review

hearings], superseded on another ground by statute as stated in *M. C. v. Superior Court* (2016) 3 Cal.App.5th 838, 846-847.)

At a six-month review hearing, when a child is under three at the time of his or her initial removal, the court has the discretion under certain circumstances to set a 366.26 hearing and to terminate reunification services. (§ 366.21, subd. (e)(3); hereafter § 366.21(e)(3).)[10] The juvenile court at the six-month review must make "two distinct determinations" in ascertaining whether it has and may exercise such discretion under section 366.21(e)(3). (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).) "First, the statute identifies specific factual findings—failure to participate regularly and make substantive progress in the court-ordered treatment plan—that, if found by clear and convincing evidence, would *justify* the court in scheduling a [366.26 hearing] to terminate parental rights. . . . [¶] The second determination . . . [is that, n]otwithstanding any findings made pursuant to the first determination, the court shall not set a [366.26 hearing] if it finds either (1) 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months . . .'; or (2) 'reasonable services have not been provided . . .' to the parent. [Citation.] In other words, the court must continue the case to the 12-month review if it makes either of these findings." (*Id.* at pp. 175-176.) But if the court, in making both determinations, concludes that it is thereby empowered to set a [366.26 hearing], it is nonetheless not *compelled* to do so.

---

[10] "If the child was under three years of age on the date of the initial removal, or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." (§ 366.21(e)(3).)

20

Section 366.21(e)(3) merely authorizes the juvenile court, in its discretion, to set a [366.26 hearing]. (*M.V.*, *supra*, at p. 176; see also *S.T. v. Superior Court* (2009) 177 Cal.App.4th 1009, 1015-1016.) If the court at the six-month review hearing exercises its discretion to set a 366.26 hearing within 120 days, it must terminate reunification services at that time. (§ 366.21, subd. (h).) But the juvenile court may not order a 366.26 hearing "unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (*Id.* at subd. (g)(1)(C)(ii).)

Reunification services offered by the agency need not be "the best that might be provided in an ideal world, but . . . [are] services [that are] reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547; see also *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 ["in reviewing the reasonableness of the reunification services provided by the Department, we must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect"].) Thus, the "adequacy of reunification plans and the reasonableness of the [agency's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) The agency is "required to 'make a good faith effort to develop and implement a family reunification plan . . . [with] the objective of providing such services or counseling "as will lead to the resumption of a normal family relationship." ' [Citation.]" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424; see also *In re Monica C.* (1995) 31 Cal.App.4th 296, 306 [under section 361.5, agency must make good faith effort "to provide reasonable services responding to the unique needs of each family"].)

B.     Standard of Review

Based upon the circumstances presented here, our review of the order terminating reunification services after a six-month review hearing is under a substantial evidence

standard.  (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)[11]  As explained above, in the case of a child under three, in order to determine whether a juvenile court is empowered at the six-month review to set a 366.26 hearing (thereby terminating reunification services), it must first make "two distinct determinations" (*M.V.*, *supra*, 167 Cal.App.4th at p. 175), namely, (1) whether there has been a " 'failure [of the parent] to participate regularly and make substantive progress in the court-ordered treatment plan' " that would justify the setting of a 366.26 hearing, and (2) notwithstanding a finding of the parent's failure to participate and make substantive progress, the setting of a 366.26 hearing may not occur because " 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months . . .'; or . . . 'reasonable services have not been provided . . .' to the parent.  [Citation.]" (*Id.* at pp. 175-176.)  We review these two determinations by the juvenile court to ascertain whether substantial evidence supports them.  (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001 [finding concerning agency's having provided reasonable services to parent reviewed for substantial evidence]; *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 690 (*Kevin R.*) [determination that "there was not a substantial probability of return to parental custody by the 12-month review date" reviewed for substantial evidence].)

In determining whether substantial evidence supports the court's decision, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.  [Citation.]

---

[11] If the juvenile court's two determinations under section 366.21, subdivision (e)(3) are supported by substantial evidence, then the court is empowered, but is not required, to set a 366.26 hearing.  (*M.V.*, *supra*, 167 Cal.App.4th at pp. 176, 179; see also *S.T. v. Superior Court*, *supra*, 177 Cal.App.4th at pp. 1015-1016.)  Thus, the decision to set a 366.26 hearing is reviewed for abuse of discretion.  (*M.V.*, *supra*, at p. 176.)  But father presents no challenge in his petition to the court's exercise of discretion in setting the 366.26 hearing, so the abuse of discretion standard does not apply here.

'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R., supra*, 191 Cal.App.4th at pp. 688-689.) And " ' "[t]he sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) It is the petitioner's burden to establish that the evidence was insufficient to support the juvenile court's findings. (*In re A.G.*, *supra*, 12 Cal.App.5th at p. 1001.) And the juvenile court's order, "like any other judgment or order of a lower court, is presumed to be correct, and all intendments and presumptions are indulged to support the order on matters as to which the record is silent. [Citation.]" (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 88.)

### C.     The Claim of Error in Terminating Services Is Forfeited

As noted, the trial court here at the six-month review hearing was required to make "two distinct determinations" in resolving whether it could, in its discretion, terminate father's services and set a 366.26 hearing. (*M.V.*, *supra*, 167 Cal.App.4th at p. 175.) First, it was required to find "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21(e)(3).) Second, if the juvenile court so found, it was prohibited from exercising its discretion to set a 366.26 hearing if it found either that "[(a)] there [was] a substantial probability that the child . . . may be returned to . . . her parent . . . within six months or [(b)] that reasonable services [had] not been provided" to the parent. (§ 366.21(e)(3); see *M.V.*, *supra*, at pp. 175-176.)

Consistent with the requirements of setting a 366.26 hearing, the juvenile court below found, inter alia, that, based upon clear and convincing evidence, (1) the parents

23

had failed to participate regularly and make substantive progress in a court-ordered treatment plan; (2) there was not a substantial probability that the minor may be returned to one or both of the parents within six months; and (3) the Department offered or provided to the parents reasonable services designed to assist them to overcome the problems that led to the minor's removal. The court therefore terminated reunification services for both parents and scheduled a 366.26 hearing for December 15, 2020.

Here, father does not challenge on appeal the juvenile court's finding that he failed to participate regularly and make substantive progress in his case plan. Likewise, father leaves unchallenged the court's finding that there was not a substantial probability the minor may be returned to father within six months. His sole claim in this proceeding is that the Department failed to offer or provide him reasonable services. We will therefore address that one claim.

The juvenile court made a finding, by clear and convincing evidence, that reasonable services were provided to the parents. It thus made a finding that there was no impediment to setting a 366.26 hearing under the second determination under section 366.21(e)(3). To state intentionally here a double negative, the court did *not* find "that reasonable services have not been provided" to father. (*Ibid.*)

In the points and authorities portion of his petition, father correctly states that before a juvenile court may order a 366.26 hearing where reunification services have been previously ordered, it must determine that reasonable services have been offered or provided by the agency. (See § 366.21, subd. (g)(1)(C)(ii).) He correctly asserts further that an essential part of services is visitation, and that "[t]he court must allow visitation as frequently as possible." (See *In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) Father argues that the parents' visitation with the minor here was both consistent and positive throughout the dependency proceedings. He claims that between March and September, the Department failed to increase visitation that had been originally established as once a week. And father contends that "[t]his limitation imposed from the beginning of COVID

24

till the present hearing was unreasonable based on the facts and therefore [was] an inadequate implementation of reunification services." He therefore, under a heading labeled "Conclusion" (emphasis and underscoring omitted), argues that "[d]ue to the inadequate visitation provided to the father, he asks that his services be continued to him."

Father's petition is inadequate in presenting a claim of error. A party's "conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case, is inadequate," and the contention will be found by the appellate court to have been abandoned. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; see also *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [appellate arguments "neither timely nor fully made" deemed forfeited].) Here, father's claim of error is based on the one-sentence statement that the Department's purported "limitation [of the amount of time for visitation] imposed from the beginning of COVID till the present hearing was unreasonable based on the facts and therefore [was] an inadequate implementation of reunification services." Without citation of authority, citation to the record, or any discussion supporting this conclusory statement, father's petition challenging the finding that the Department offered or provided reasonable services must be deemed abandoned. (See *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [appellate court has no obligation to "develop the appellants' arguments for them"].)

Even were we to overlook the fact that father's argument that the juvenile court erred was inadequate, there is a second obstacle preventing this court's review of his petition, namely, his failure to preserve the no-reasonable-services argument for consideration in this petition for extraordinary writ. Father, who was represented by counsel, did not argue below that the family services provided or offered by the Department were not reasonable. In particular, the trial brief he submitted in connection with the six-month review hearing contained no such argument; his opposition to the

25

termination of services recommended by the Department was based upon the contention that he had made reasonable efforts to comply with his case plan.  Likewise, father's written objections to the Department's report contained no assertion that the Department had failed to offer or provide reasonable services.  And father's counsel did not argue at the six-month review hearing that the Department had failed to offer or provide reasonable services, based upon inadequate visitation or otherwise.  Rather, counsel argued that personal contact with the minor that was critical because of his infancy "was cruelly taken away . . . not by the Court, not by Social Services, but by the circumstances [of the COVID-19 pandemic]."[12]  Father's counsel asserted further at the hearing that, "due to no one's interference or fault, [father] was denied four months of essentially in-person visitation."

In a supplemental letter brief,[13] counsel argues that father in fact raised below the claim that the Department failed to offer or provide reasonable services.  He asserts that father contended that in-person visitation was suspended for four months due to the COVID-19 pandemic, and that "the normal progression of visits:  supervised, unsupervised, overnight and finally return of the child [were] irretrievably broken and it [was] not reasonable to replace in-person interactions with impersonal audio-video non-

---

[12] Likewise, there is no record that, at the three-month review hearing on May 19, 2020—two months after visitation, due to the COVID-19 pandemic, was changed from in-one person visit per week to one weekly non-contact video visit with the minor—father asserted that the services offered or provided by the Department were not reasonable, based upon the level of visitation provided (or upon any other ground).

[13] The Department in its opposition to the petition did not raise the issue of father's potential forfeiture of the no-reasonable-services argument.  We requested, pursuant to Government Code section 68081, supplemental briefing from the parties as to whether father raised the argument below, and, if not, whether it had been forfeited.  We have received and have carefully considered the supplemental letter briefs submitted by the parties.

26

contact visits." (Original underscoring.) Father's counsel concludes that "[t]he lack of in-person visitation for four months[] had a significant impact on this case."

We disagree with the assertions made by father's counsel in his supplemental letter brief. Preliminarily, we note that the contention made in the letter brief concerning reasonable services *is not the argument made in the petition.* As noted above, the claim father presented in the points and authorities in support of the petition was that the Department had failed from the beginning to increase visitation from its original frequency of once per week. He concluded in the petition that "[t]his limitation imposed from the beginning of COVID till the present hearing was unreasonable based on the facts and therefore [was] an inadequate implementation of reunification services." Thus, father's argument in the petition was that the failure to increase the frequency of visitation over the entire period of February to September—not the fact that visitation was limited for four months to non-contact video visits with the minor—constituted the Department's failure to offer or provide reasonable services.

Putting aside the variance between the arguments in father's petition and the supplemental brief, we have reviewed the record anew concerning father's contention in the supplemental brief that he raised the no-reasonable-services argument at the six-month review hearing. Neither the argument raised in the petition nor the one asserted in his supplemental brief was made in the juvenile court below.

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.] [¶] Dependency matters are not exempt from this rule. [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted, superseded on other grounds by statute as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) Thus, "a parent is prevented from challenging the reasonableness of services on appeal if the issue was not first brought to the attention of the juvenile court. [Citation.]" (*Amanda H. v.*

27

*Superior Court* (2008) 166 Cal.App.4th 1340, 1347-1348, fn. 5 (*Amanda H.*); see also *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886 [parent waived right to contend agency failed to offer or provide reasonable services by failing to assert it before juvenile court; consideration of issue for first time on appeal would be "unfair" to trial court and the agency]; *In re Christina L.* (1992) 3 Cal.App.4th 404, 416 ["If Mother felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan[.]"].)

One of the chief reasons for the forfeiture doctrine is that " 'simply . .. it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' [Citation.]" (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184–185, fn. 1, original italics.) That rationale is pertinent here. Had father, at the six-month review hearing, questioned the reasonableness of services the Department had offered or provided with respect to visitation, it could have responded to the position by offering testimony from the case worker and by submitting argument to counter any specific alleged failings father claimed existed, and the court could have considered the parties' respective positions. Since father did not challenge at any time below the reasonableness of the services provided by the Department, he has forfeited any challenge to the juvenile court's finding that such services were reasonable. (*Amanda H.*, supra, 166 Cal.App.4th at pp. 1347-1348, fn. 5; *In re Kevin S.*, *supra*, 41 Cal.App.4th at pp. 885-886; *In re Christina L.*, *supra*, 3 Cal.App.4th at p. 416.)

### D. Father's Contention Lacks Merit

Although we have concluded that father has forfeited his challenge to the juvenile court's finding that the Department offered or provided reasonable services, his claim

would nonetheless fail if we were persuaded to consider its merits. The record shows[14] that there were reasons, apart from the COVID-19 pandemic, that limited the progress of the parents' visitation with the minor. The parents did not participate fully under their respective plans, and there was significant concern by the Department concerning the parents' failure to submit to random drug testing and to participate in mental health evaluations. The caseworker, Son, testified that the Department "did not have the capacity to increase visitation," but that even if there had been such capacity, increased visitation for the parents would have been unlikely because of the extent of the parents' progress, their failure to consistently submit to drug testing, and the Department's concerns that the parents were still actively using substances. Son also expressed concerns about the parents' video visitation with the minor, "where the parents were falling asleep and not attentive."

Based upon the circumstances presented and the limited record before us (see fn. 14, *ante*), we conclude that there was substantial evidence supporting the juvenile court's finding that the Department offered or provided reasonable reunification services to the parents. (*In re A.G.*, *supra*, 12 Cal.App.5th at p. 1001.) Acknowledging that the juvenile court made this finding by clear and convincing evidence, we conclude— considering the record in a light most favorable to the Department, giving due deference to the juvenile court's evaluation of the credibility of witnesses, resolution of conflicting evidence, and drawing of reasonable inferences from the evidence—that "the record as a whole contains substantial evidence from which a reasonable fact finder could have

---

[14] In conducting a review of the merits of father's claim, we must emphasize that we are dealing with a limited record *because of* father's failure to raise the no-reasonable-services argument below. Had father asserted it, we would anticipate that the record would have included argument from the Department's counsel and additional testimony from the assigned social worker on the question of whether the Department offered or provided reasonable services.

found it highly probable that the fact [that reasonable services were offered or provided by the Department] was true." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.)

It is very apparent to this court that father loves the minor very much, and that he made some effort in the nine months from the minor's removal to the date of the six-month review hearing to address the issues that led to the minor's removal. Here, however, father did not assert a challenge below to the issue of whether the Department offered or provided him reasonable reunification services, and the claim of error is therefore not cognizable. He is, in any event, not entitled to the relief sought in the petition.

## III. DISPOSITION

The petition for extraordinary writ is denied.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:


_____
ELIA, Acting P.J.



_____
DANNER, J.




*S.C. v. Superior Court*
**H048483**